United States District Court
Southern District of Texas
FILED

FEB 24 2000

Michael N. Milby, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| MERRILL LYNCH, PIERCE, FENNER & SMITH INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | NO. C-00-64 |
| VERONICA CLARK, | § § | |
| Defendant. | § § | |

## MEMORANDUM IN SUPPORT OF MERRILL LYNCH'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### A. PRELIMINARY STATEMENT OF FACTS

Merrill Lynch respectfully submits this memorandum of law in support of its motion for a temporary restraining order and preliminary injunction to protect against the unlawful misappropriation by the Defendant Veronica Clark ("Defendant") of Merrill Lynch's trade secret customer list and customer information. The Merrill Lynch customer list serviced by the Defendant and which the Defendant is attempting to misappropriate represents **hundreds** of Merrill Lynch clients, over **$200 million** in assets under Merrill Lynch management, and over **$2 million** in revenue for Merrill Lynch in 1999 alone.

By her conduct, Defendant not only has misappropriated Merrill Lynch's trade secrets and committed the torts of conversion and unfair competition, but the Defendant also has intentionally breached her contractual obligations to Merrill Lynch not to confiscate Merrill Lynch's confidential customer information and records and not to divert this information to a competitor firm.

5-

Defendant commenced employment with Merrill Lynch in October of 1994.  As a

condition of her employment with Merrill Lynch, Defendant agreed in writing and on an annual

basis to abide by Merrill Lynch's Compliance Outline that provides, in relevant part, as follows:

### CONFIDENTIALITY OF CLIENT INFORMATION

**You may not discuss the business affairs of any client
with anyone,** including other employees except on a need-
to-know basis.  **Information or records concerning the
business of the Firm and/or its clients may not be
released** except to persons legally entitled to receive them.

Exhibit "A" to Merrill Lynch's Complaint (emphasis added).  Defendant also agreed to abide by

Merrill Lynch's Guidelines for Business Conduct, which provide, in relevant part, as follows:

Merrill Lynch's assets include more than its capital - there
are its premises, equipment, **information,** business plans,
ideas for new products and services, **client lists,** and, most
important, in a very real sense, its people.  **It is expected
that employees will use these assets only for the
purposes intended and not for their personal benefit**
unless they have been approved for general employee or
public use.  This even extends to business opportunities that
come to employees as a result of their employment - they
are the proprietary opportunities of Merrill Lynch.

Exhibit "B" to Merrill Lynch's Complaint (emphasis added).  Defendant further agreed in the

Merrill Lynch Conflict of Interest agreement that:

**I agree that I will not, during or after my employment
with Merrill Lynch, use or disclose to another** any
confidential information or business secrets relating to
Merrill Lynch.

Exhibit "C" to Merrill Lynch's Complaint (emphasis added).

In consideration of the above covenants by Defendant, Merrill Lynch agreed to,

and in fact did, compensate her throughout her employment with Merrill Lynch and provided her

with Merrill Lynch operational and sales systems, research and development, and support,

2

reputation and goodwill, and information regarding and access to Merrill Lynch customers.

## B. MERRILL LYNCH IS ENTITLED TO INJUNCTIVE RELIEF

The issuance of injunctive relief in this case is proper because Merrill Lynch has demonstrated: (i) a substantial likelihood of success on the merits; (ii) a substantial threat of immediate and irreparable harm which cannot be compensated by damages; (iii) that greater injury will result from denial of the injunction than from its being granted; and (iv) that an injunction will not disserve the public interest. Mississippi Power & Light Co. v. United Gas Pipeline, 760 F.2d 618, 621 (5th Cir. 1985); Canal Authority of State of Florida v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974).

### A.  Likelihood of Success on the Merits

Merrill Lynch is entitled to a temporary restraining order and preliminary injunctive relief because it can demonstrate a likelihood of success on the merits on at least two separate grounds: (i) to enforce the various agreements signed by Defendant; and (ii) to protect against the unlawful misappropriation of Merrill Lynch's trade secrets.

### 1.  Defendant Has Breached her Non-Disclosure Agreements With Merrill Lynch

Merrill Lynch will succeed on its claim for breach of Defendant's non-disclosure agreements. Defendant expressly agreed in the Merrill Lynch Compliance Outline, Guidelines for Business Conduct, and Conflict of Interest agreements not to release any Merrill Lynch information or records to outsiders. See Exhibit "A"–"C" to Merrill Lynch's Complaint. These non-disclosure clauses clearly are enforceable under Texas law. For example, in Merrill Lynch v. Isom, 4:99-CV-538-L (N.D. Tex. 1999), the court issued a temporary restraining order against a former Merrill Lynch broker who had signed these same agreements and held:

> Plaintiff's business conduct guidelines and provisions for the confidentiality of client information **prohibit Defendant from using Plaintiff's records and information.** Additionally, Defendant signed a conflict of interest statement in which she agreed that she would not, during or after her employment with Plaintiff, use or disclose any confidential information or business secrets relating to Plaintiff.

Exhibit **"A"** at 2 (emphasis added); see also Zep Mfg. Co. v. Harthcock, 824 S.W.2d 654, 663 (Tex. App. Dallas, 1992, no writ); Micromanipulator Co. v. Bough, 779 F.2d 255, 258 (5th Cir. 1985) ("We find that Bough Corporation revealed the identity of Micromanipulator's customers to 'others' when it solicited orders from Micromanipulator's customers on behalf of MC Systems and subsequently disclosed to MC Systems the name of any purchasers."). Like the defendant in *Isom*, Defendant's solicitation of Merrill Lynch customers is a clear violation of these agreements.

> 2. **Defendant Has Misappropriated Merrill Lynch's Trade Secret Customer Information**

Merrill Lynch also will succeed on its claim for conversion and misappropriation of its trade secret customer information. See, e.g., Picker Int'l v. Blanton, 756 F. Supp. 971, 979 (N.D. Tex. 1990) ("During employment and after employment, an employee is obligated not to divulge their employer's trade secrets, whether or not the use or disclosure of such trade secrets are prohibited or restricted by an express contract"). Merrill Lynch's customer list is the trade secret property of Merrill Lynch and cannot be misappropriated by former employees such as Defendant. See, e.g., Isom (Exhibit **"A"**); Merrill Lynch v. Wright, No. 3:93-CV-1101-D (N.D. Tex. 1993) (Exhibit **"B"**); Merrill Lynch v. Cole, No. 4:92-CV-499-Y (N.D. Tex. 1992) (Exhibit **"C"**); see also Merrill Lynch v. Davis, 1998 WL 920328 * 1 (N.D. Tex. Dec. 30, 1998); Merrill Lynch v. Chapman, 1998 WL 792501 * 3 (N.D. Tex. Nov. 3, 1998).

4

The Fifth Circuit consistently has granted employers injunctive relief to protect their trade secret customer lists regardless of the existence of any "express" non-solicitation covenant. In Zoecon Indus. v. American Stockman Tag Co., the Fifth Circuit fully upheld the district court's injunction enjoining the defendants from soliciting or making sales to the plaintiff/employer's customers on trade secret grounds, holding as follows:

> We hold that **the customer list is a trade secret** . . . . **This list contained names and addresses, as well as information** on the type of ear tag purchased by each customer, the **amount purchased, the dates of purchases,** and **other information about the customers**. The district court found that this information, which was not known to the general public, was used by (plaintiff) to project future sales and to service its customers.

713 F.2d 1174, 1176-77 (5th Cir. 1983) (emphasis added). The court went on to observe that "because of this holding, it is unnecessary to address the validity of the non-competition agreement under Texas law." Id.

In Molex, Inc. v. Nolen, the Fifth Circuit again reached the identical result, enjoining the defendant/employee from soliciting or accepting business from his former employer's customers, holding that "Texas courts have routinely permitted injunctions to issue barring employees from soliciting the customers of their former employers." 759 F.2d 474, 476 (5th Cir. 1985) (emphasis added).

Likewise, Texas state courts consistently grant employers injunctive relief under these circumstances. In Rugen v. Interactive Business Sys., Inc., for example, the court prohibited the defendant from "calling on, soliciting, or transacting business" with customers of her former employer despite the fact that the defendant's noncompetition agreement was unenforceable. 864 S.W.2d 548, 550 (Tex. App. 1993). The court first recognized that even

5

CutePDF - www.tesis.com

though the defendant was not subject to any valid contractual restraints, "[a]n injunction is appropriate when necessary to prohibit an employee from using confidential information to solicit her former employer's clients." Id. at 551. Based on evidence in the record that defendant possessed confidential information of her former employer and was in direct competition with it, the court affirmed the trial court's injunction, noting that the "injunction does not prevent [defendant] from competing with [her former employer]. Instead, the injunction prohibits her from soliciting or transacting business with . . . customers, whose identities she was able to obtain through confidential information." Id. at 551-52.[1]

Again, in Collins v. Ryon's Saddle & Ranch Supplies, Inc., the trial court issued a temporary injunction prohibiting "Collins from soliciting or contacting directly or indirectly all persons who placed orders with Ryon during Collins' term of employment. 576 S.W.2d 914 (Tex. App. 1979). The Texas Court of Appeals affirmed, holding that "[e]ven though no written contract is involved, an employee cannot use confidential information or trade secrets acquired while working for her former employer." Id.

Similarly, in Wright Hydraulics, Inc. v. Womack Machine Supply Co., the court upheld the trial court's injunction restraining the defendant/employee from "contacting" the customers of his ex-employer for two years. 482 S.W.2d 34 (Tex App. 1972). In reaching this result, the court expressly relied upon 28 A.L.R.3d 7, "Former Employee's Duty, In Absence of Express Contract, Not to Solicit Former Employer's Customers or Otherwise Use His Knowledge of Customer Lists Acquired by Earlier Employment," and emphasized as follows:

---

[1] The court noted that because defendant was in direct competition with her former employer and possessed its confidential information, "it is probable that [defendant] will use the information for her benefit and to the detriment of [her former employer]." Rugen, 864 S.W.2d at 552.

6

> [The] action of the court would be proper because truly
> confidential information secured by reason of fiduciary
> relationship may not be used or disclosed to the fiduciary's
> detriment **irrespective of an agreement not to do so**.

Id. (emphasis added); see also American Precision Vibrator Co. v. National Air Vibrator Co., 764 S.W.2d 274, 276-77 (Tex. App. 1988) (court enjoined solicitation and acceptance of business from former employer's customers, despite the absence of any covenant, stating that "[i]n Texas, customer lists have bee recognized as trade secrets" and "courts condemn the employment of improper means to procure trade secrets"); Johnston v. American Speedspreading Academy, Inc., 526 S.W.2d 163, 166 (Tex. App. 1975) (same).

Applying this law, Texas federal courts have expressly held that Merrill Lynch's customer information is entitled to trade secret protection. In Merrill Lynch v. Wright, the Northern District of Texas held that Merrill Lynch's customer information warranted trade secret status:

> **The court need not decide whether Merrill Lynch's
> non-solicitation agreement is enforceable under Texas
> law to enjoin the defendants from using business trade
> secrets and confidential information that are entitled to
> protection under Texas law.**
>
> Defendants argue that Merrill Lynch's customer list is not a
> trade secret. They aver that Merrill Lynch acquired its
> knowledge of the customers from the defendants'
> identification of the vast majority of their customers, that
> the identities of defendants' customers are readily
> ascertainable by independent investigation or from sources
> other than Merrill Lynch's purported customer list, and that
> defendants know the identity of their customers from their
> own recollection, independent of any customer list. The
> court declines to accept this reasoning.
>
> A trade secret may consist of any compilation of
> information that is used in one's business, and that gives it
> an opportunity to obtain an advantage over competitors

7

who do not k now or use it.  Numed, Inc. v. McNutt, 724
S.W.2d 432, 435 (Tex. App. 1987, no writ) (quoting
Restatement (First) of Torts § 757 (1939)).  A customer list
can be a trade secret.  Zoecon Indus. v. American Stockman
Tag Co., 713 F.2d 1174, 1179 (5th Cir. 1983).  To qualify as
a trade secret, the information cannot be generally known
by others in the same business or readily ascertainable by an
independent investigation.  Id.

**The court finds from the record that Merrill Lynch's
customer list gives Merrill Lynch an added advantage
over its competitors.  The list includes not only the
names and addresses of customers, but also contains
data on customers' financial net worths, annual
incomes, and investment strategies**.  The list (including its
contents) is the result of extensive expenditures of money by
Merrill Lynch and contains data derived from numerous
sources.  Because of its significant value, Merrill Lynch
goes to great lengths to prevent its disclosure.  It requires
its financial consultants – including Wright and Dickey – to
sign a "Compliance Outline" [providing for nondisclosure
and confidentiality of information]. . . .
**The court finds therefore that Merrill Lynch's customer
list contains confidential information worthy of trade
secrets protection**.

Exhibit **"B"** (Memorandum at  pp. 5-7) (emphasis added).[2]

_____

[2] The court in Wright also specifically rejected the argument that Merrill Lynch's customer list
somehow is not entitled to trade secret protection simply because the defendant may have helped
build or maintain that list while working as an agent and representative of Merrill Lynch:

> The fact that defendants' work contributed to Merrill
> Lynch's confidential data base does not deprive this
> information of trade secret protection.  Defendants' own
> efforts to develop customer information were made while in
> the employ of Merrill Lynch, and with Merrill Lynch's
> direct or indirect assistance. . . .  Accordingly, Merrill Lynch
> has shown it will likely succeed on the merits with respect
> to the disclosure of trade secrets and business information.

Exhibit **"B"** at 7; see also Davis, 1998 WL 920328 at * 2  ("The fact that Davis' work or effort
contributed to Merrill Lynch's confidential data base, however, does not deprive this information

Likewise, in Merrill Lynch v. Cole, the court specifically held that Merrill Lynch's customer list is a trade secret under Texas law, ruling as follows:

> **Now, the second matter on which I'm granting it is based on trade secrets**. And based on trade secrets, the Court is relying on the case from Judge Fitzwater, Ruscitto versus Merrill Lynch. . . . And in that case Judge Fitzwater was affirmed, his opinion which stated that **courts have . . . repeatedly held Merrill Lynch customer lists warrants trade secret protection.**
>
> **\*\*\*\***
>
> [T]he documents and data which defendants took from its files in connection with their employment with the plaintiff, it included **statements of plaintiff's clients, net financial worth, annual incomes, trading histories and investments, names and addresses. These records which the plaintiff treated as confidential and repeatedly instructed its employees was confidential,** they were assembled and created by the plaintiff over a period of years, even though some of it might have come through -- most of it probably did come through the defendants, at least those particular customers. But still, it was brought about through a great expenditure on the part of plaintiff Merrill Lynch.
>
> Its expense included advertising and sales support staff, training programs, computer services and equipment, sales literature, seminars, operational publications, promotional events, quotron machines and clerical expenses. It goes without saying that those things occur and are furnished by plaintiff. **Plaintiff has placed its reliance upon decisional law in this state which holds that it is proper to treat plaintiff's customer lists as a trade secret and to prevent by means of injunction a former employee from using that list.**

Exhibit **"C"** (hearing transcript) (emphasis added); see also Davis, 1998 WL 920328 at * 1 ("This court has routinely held that Merrill Lynch's customer lists qualify as trade secrets."); Chapman,

---

of trade secret protection. Davis engaged in these efforts to develop customer information while she was employed by Merrill Lynch, with Merrill Lynch's direct or indirect assistance.").

1998 WL 792501 at * 3 (same).

Indeed, this Court very recently entered an order in the case of Merrill Lynch v. Stephen Riehe, No. 99-2864, (Order of November 10, 1999)(Exhibit **"I"** hereto) in which he enjoined a financial consultant from Merrill Lynch's Corpus Christi office from further solicitation of Merrill Lynch customers, and from acceptance of account transfer forms from those previously solicited. Significantly, he did so based solely on the confidential status of the customer information at issue; there was no nonsolicitation of customers agreement at issue.

Consistent with these decisions, several Texas federal courts have held under circumstances similar to those of the present action that Merrill Lynch is entitled to injunctive relief even in the absence of a restrictive covenant. In Merrill Lynch v. Miller, Judge Lake of this Court issued a temporary restraining order against a group of five Merrill Lynch brokers enjoining them from soliciting Merrill Lynch customers even in the absence of any express nonsolicitation covenant signed by three of the brokers. See Miller, No. H-98-2681 (S.D. Tex. 1998) (Exhibit **"D"**); accord Isom (Exhibit **"A"**); Merrill Lynch v. Thompson, No. H-98-4271 (S.D. Tex. 1998) (Exhibit **"E"**); Merrill Lynch v. Shellnut, No. 4:97 CV 467-A (N.D. Tex. 1997) (McBryde, J.) (Exhibit **"F"**);Comeaux v. Merrill Lynch, No. H-96-0194 (S.D. Tex. 1996) (Rosenthal, J.) (Exhibit **"G"**); Merrill Lynch v. Walker, No. 4:96-CV-920-Y (N.D. Tex. 1996) (Means, J.) (Exhibit **"H"**).

Courts throughout the country also repeatedly have afforded Merrill Lynch and other securities brokerage firms' customer lists trade secret status and issued injunctive relief to protect these lists. See, e.g., Merrill Lynch v. Cross, 1998 WL 122780 at *2 (N.D. Ill. March 13, 1998) ("Customer lists are entitled to trade secret protection under Illinois law."); IDS Life

10

Insurance Co. v. Sun America, 958 F. Supp. 1258, 1279-80 (N.D. Ill. 1997) ("In this case,

plaintiffs claim that defendants are in possession of plaintiffs' records of customer names,

addresses, and investment characteristics and are using that information to solicit and serve

plaintiffs' customers. We find that plaintiffs' customer lists and files are likely to constitute trade

secrets."), aff'd in part, vac. in part, 136 F.3d 537 (7th Cir. 1998); Merrill Lynch v. Zimmerman,

1996 WL 707107 at *2 (D. Kan. Oct. 1, 1996) ("[T]he Court concludes that the Documents

improperly taken by the defendant constitute a compilation within the meaning of V.A.M.S. §

417.453(4). . . As a result, the Court concludes that . . . the Documents constitutes a trade

secret."); IDS Life Ins. Co. v. Smithson, 843 F. Supp. 415, 418 (N.D. Ill. 1994) ("Additionally, §

2(d) of the Illinois Trade Secrets Act, ILCS 1065/2(d), protects IDS's interest in the confidential

information such as customer identity, addresses, and financial data . . . An injunction is therefore

appropriate to protect IDS's proprietary interest in these trade secrets and to prevent the secrets

from being disclosed to competitors or unjustly used by Smithson for his own benefit."); Orbach

v. Merrill Lynch, 1994 WL 900431 at *6 (E.D. Mich. Jan. 11, 1994) (applying Restatement law

and holding that "[t]he Michigan Court of Appeals . . . has held that Merrill Lynch's client list is

the property of Merrill Lynch . . . [Merrill Lynch] has a strong likelihood of success on the merits

of this claim."); Merrill Lynch v. Kramer, 816 F. Supp. 1242, 1246 (N.D. Ohio 1992) ("Even

absent a specific contractual provision, Merrill Lynch's customer list is entitled to trade secret

protection under Ohio law."); Merrill Lynch v. Hegarty, 808 F. Supp. 1555, 1558 (S.D. Fla.

1992) (holding that Merrill Lynch "ha[s] a legitimate interest in the [customer] list because it is a

trade secret"), aff'd, 2 F.3d 405 (11th Cir. 1993).

　　　　In Zimmerman, for instance, the United States District Court for the District of

Kansas applied the Uniform Trade Secrets Act and issued injunctive relief even though the

defendant had not signed a nonsolicitation contract:

> Under Missouri's Uniform Trade Secrets Act ("Act"), the plaintiff may seek the court's protection and redress for the misappropriation of its trade secrets.  See V.A.M.S. § 417.455 (court may enjoin an actual or threatened misappropriation of a trade secret).
>
> \* \* \* \*
>
> Based on the evidence presented, the court concludes that the Documents improperly taken by the defendant constitute a compilation within the meaning of V.A.M.S. § 417.453(4), that **the plaintiff derives independent economic value from the fact that the Documents are not generally known to or properly readily ascertainable by its competitors, such as DBI, and that the Documents are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.  Moreover, the plaintiff's evidence also indicates that the defendant was unequivocally aware that the Documents were intended to be confidential.  As a result, the court concludes that, for the purpose of this TRO motion, the Documents constitutes a trade secret.**  V.A.M.S. § 417.453(4).

1996 WL 707107 at \*1-2 (emphasis added).

Applying the above case law to the instant case, Merrill Lynch's customer list and customer information are entitled to trade secret protection.  In this case, the value of Merrill Lynch's trade secret customer list is immeasurable.  As noted above, while employed with Merrill Lynch, Defendant was assigned to service hundreds of Merrill Lynch accounts which represent over **$200 million** in assets under Merrill Lynch management and which generated over **$2 million** in revenue for Merrill Lynch in 1999 alone.  The value of this information is a direct result of the fact that Merrill Lynch's trade secret customer information is not known by, and is not readily ascertainable by proper means by, any competitor who could profit from knowledge of this information.

In addition, and as set forth in the accompanying affidavit, Merrill Lynch goes to

extensive lengths to protect the secrecy of its customer list and information, including by having

Defendant sign numerous nondisclosure and confidentiality agreements. See Exhibits "A" – "C"

to Complaint; see also Zimmerman, 1996 WL 707107 at *2 (noting that where defendant

similarly signed confidentiality agreements "defendant was unequivocally aware that the

Documents were intended to be confidential").

       In sum, Merrill Lynch clearly is entitled to injunctive relief to enforce the terms of

Defendant's contractual agreements not to improperly use or disclose Merrill Lynch's customer

list and to protect against the conversion and misappropriation of its trade secret customer list and

confidential customer information.

    **B.**    **No Adequate Remedy at Law.**

       It is well accepted "that in most instances, courts presume irreparable harm where

a trade secret has been misappropriated." Merck & Co. v. Lyon, 941 F. Supp. 1443, 1455

(M.D.N.C. 1996); see also Monovis, Inc. v. Aquino, 905 F. Supp. 1205, 1234 (N.D.N.Y. 1994)

("Irreparability of the harm is presumed in cases of trade secret misappropriation."). Even

without the benefit of this presumption, however, Merrill Lynch will suffer irreparable harm on at

least three separate levels in the absence of injunctive relief.

       First, absent injunctive relief it will be impossible to determine Merrill Lynch's

damages with any reasonable degree of certainty. In Merrill Lynch v. Stidham, for example, the

Fifth Circuit held that the misappropriation of Merrill Lynch's trade secrets caused irreparable

harm to Merrill Lynch, ruling as follows:

> The injury here is such that damages could not adequately
> compensate. Were defendants permitted by the law to
> exploit the clientele of their former employers, every
> investment that reasonably flowed from the exploitation

should be included in the damages award.  **How such a figure could be arrived at escapes us**.

658 F.2d 1098, 1102 (5th Cir. 1981) (emphasis added).  Similarly, in Merrill Lynch v. Bradley, the Fourth Circuit reached the same conclusion expressly holding that Merrill Lynch "faced irreparable non-compensable harm in the loss of its customers." 756 F.2d at 1055.

In Ruscitto v. Merrill Lynch, the court likewise held that "[t]he factual record supports a finding that Merrill Lynch is threatened with irreparable harm by Ruscitto's breach of the Agreement." 777 F. Supp. 1349, 1354 (N.D. Tex.), aff'd 948 F.2d 1286 (5th Cir. 1991), cert. denied, 112 S. Ct. 1994 (1992);  see also Molex, 759 F.2d at 478 (in upholding injunctive relief to prevent misappropriation of employer's customer list, the Fifth Circuit emphasized that "future damages would have been difficult if not impossible to ascertain and thus the trial court was justified in granting injunctive relief.") (quoting Ieter v. Associated Rack Corp., 607 S.W.2d 272, 276 (Tex. App. 1980, writ ref'd n.r.e.), cert. denied, 102 S. Ct. 507 (1981)); FMC Corp. v. Varco, 677 F.2d 500, 504 (5th Cir. 1982) (injunctive relief necessary because trade secrets "could be lost before a full trial on the merits could be held").

In Zimmerman, the court found irreparable harm under circumstances identical to the present action and concluded as follows:

> **In order to calculate the plaintiff's damages without a TRO, the court would have to look at every transaction that reasonably flowed from the defendant's conversion of the plaintiff's trade secrets.  Because courts are not clairvoyant, the court cannot possibly predict how much the plaintiff would have earned had the defendant not converted the plaintiff's trade secrets.  Moreover, without a TRO, the plaintiff will lose good will from certain clients when they discover that their supposedly confidential information was stolen.  As a result, the court concludes that the plaintiff has met the second prong**

14

of the TRO analysis due to the fact that, without a TRO, the
plaintiff's damages could not be accurately calculated.

1996 WL 707107 at *2 (emphasis added).

Prior to the Defendant's resignation, she serviced hundreds of Merrill Lynch
accounts, representing over **$2 million** in revenues for Merrill Lynch in 1999.  It is impossible to
determine at this time the number of Merrill Lynch clients who will be pirated away by Defendant.
Nor is it possible to determine with any degree of certainty the revenues each of these clients will
generate not only this year, but 5, 10, or 50 years into the future.  Moreover, it is impossible to
determine the number of referrals that Merrill Lynch would have received from these accounts but
for Defendant's conduct.  Accordingly, Defendant's breach of her agreements and unlawful
conversion of Merrill Lynch's trade secrets involves financial loss to Merrill Lynch that is
incapable of measurement, requiring the issuance of an injunction to protect Merrill Lynch from
irreparable harm.

Second, in addition to the fact that Merrill Lynch's damages are impossible to
determine with any degree of certainty, irreparable harm also lies in the fact that Merrill Lynch
clients expect their financial information, their market transactions, and their investment assets to
be known only to themselves, Merrill Lynch, and Merrill Lynch employees.  If Defendant is
permitted to continue her misconduct, each client's sensitive financial information will lose its
confidentiality.  In Kramer, for example, the Northern District of Ohio held as follows:

> Plaintiff argues with equal strength that irreparable and
> immeasurable harm lies in the fact that Merrill Lynch clients,
> when they discover that their financial information, market
> transactions, and investment assets which they presumed
> were held in confidence have been disclosed, will lose trust
> and confidence in Merrill Lynch.

816 F. Supp. at 1247; see also Isom (Exhibit **"A"** at p. 2-3) ("The loss of confidentiality of

15

Plaintiff's confidential information results in the loss of clients' confidence and trust in Plaintiff's ability to maintain confidentiality."); Wright (Exhibit **"B"** at p. 10) ("[D]isclosure of confidential information and business trade secrets . . . constitutes a substantial threat of irreparable injury in the form of loss of customer goodwill, trade secrets, and lost business."); Zimmerman, 1996 WL 707107 at *2 ("[W]ithout a TRO, the plaintiff will lose good will from certain clients when they discover that their supposedly confidential information was stolen"). Just as in Zimmerman, Isom, Wright, and Kramer, injunctive relief is necessary in this case to protect the confidentiality of Merrill Lynch's customer information and records.

Third, immediate injunctive relief also is necessary to protect the stability of Merrill Lynch's Gulf Coast Complex and to discourage other employees from confiscating Merrill Lynch's confidential customer list and information and from violating their duty not to disclose and divert confidential information and customers. In Merrill Lynch v. Patinkin, the court specifically considered this risk and granted Merrill Lynch injunctive relief:

> The court believes that the denial of the extension of the TRO under the circumstances presented in this case would leave Merrill Lynch vulnerable to the same conduct from other employees. Hence, the potential harm plaintiff faces, on several levels, is enormous.

1991 U.S. Dist. Lexis 6210 at * 17 (N.D. Ill. 1991) (emphasis added); see also Kramer, 816 F. Supp. at 1247 ("Finally plaintiff argues convincingly that injunctive relief is required to protect it from similar conduct by other employees and to discourage competitor firms . . . from paying such employees large sums of money to induce them to breach their contracts, to confiscate confidential client records and to divert those clients to the competitor.").

In sum, Merrill Lynch faces significant irreparable harm on numerous levels,

including the infliction of incalculable damages, the loss of client confidentiality, and the threat to office stability, all of which necessitate the issuance of injunctive relief.

### C.    Return to the Status Quo.

Merrill Lynch seeks to return to the status quo to the extent Defendant shall be required to return all confidential data and information she has wrongfully diverted from Merrill Lynch.  A return to the status quo also requires that Defendant be enjoined from further solicitation of Merrill Lynch's customers.  In addition, Defendant should not be permitted to enjoy the fruits of her illegal acts - she also must be enjoined from engaging in or receiving business from any customer she has solicited in violation of her agreements and in violation of Merrill Lynch's trade secret rights.  See generally Elcor Chem. Corp. v. Agri-Sul, Inc., 494 S.W.2d 204, 211 (Tex. Ct. App. 1973) (remanding to trial court to enlarge scope of injunction, and holding that an injunction which prohibits only "further disclosure" is "utterly useless" and that employee must be "denied the benefits and profits flowing from the wrongdoing").

To allow Defendant to profit from her own opportunistic wrongdoing by accepting business from clients she has solicited in violation of Merrill Lynch's contractual and trade secret rights would promote deliberate pre-planned breaches of legal obligations and strip the Court of its equitable power to remedy these breaches and prevent irreparable harm.  Thus, it is not surprising that courts routinely enjoin former Merrill Lynch brokers from accepting business from clients they have wrongfully solicited.

In Zimmerman, for example, the court noted that "the plaintiff correctly points out that the defendant should not be permitted to profit from his own wrongful act."  1996 WL 707107 at *2.  Likewise, in Orbach the court enjoined a former broker from accepting business and account transfers from the clients she wrongfully solicited:

17

> [T]o permit plaintiff to accept business from these clients
> would allow plaintiff to reap the benefit of his blatant
> disregard of his contractual obligations . . .The practical
> effect of such an order cannot be overlooked . . . **Allowing
> plaintiff to accept business from these clients on the
> basis of the language in the Agreement, would
> encourage, and sanction, future parties in plaintiff's
> position to breach their contractual duties as much as
> possible, because the more clients which can be solicited
> before an injunction is entered, the more clients plaintiff
> will be able to have transferred.**

1994 WL 900431 at *9 (emphasis added).

Merrill Lynch does not seek to prevent Defendant from continuing her present

employment in the brokerage industry, even with a competitor.  Rather, Merrill Lynch, seeks only

an immediate return to the status quo by enjoining Defendant from future attempts to solicit

Merrill Lynch customers and by enjoining Defendant from accepting business from any client she

has wrongfully solicited.  Such an order would return the parties to the status quo without any

prejudice to Defendant's ability to earn a living. See Ruscitto, 777 F. Supp. at 1354 ("The present

record plainly shows that Merrill Lynch's request is reasonable.  Ruscitto may continue to

compete as a stock broker in the same locale.  she is merely restricted for one year from soliciting

clients whom she served or whose names became known to her while employed at Merrill

Lynch.").

     **D.**    **Granting Injunctive Relief Outweighs Denial And Serves the Public
Interest**

The benefit of injunctive relief to Merrill Lynch far outweighs any detriment to

Defendant and serves the public interest.  An injunction would protect Merrill Lynch's highly

sought trade secret customer information and the confidentiality of Merrill Lynch's customer

records.  In Picker Int'l, the court clearly articulated the fundamental public interest in the

18

protection of trade secrets:

> The public interest is served by protecting trade secrets.  In
> Metallurgical Industries, Inc. v. Fourtek, 790 F.2d 1195,
> 1201 (5th Cir. 1986), the court stated as much when it
> wrote:
>
> > That the cost of devising the secret and the
> > value of the secret provides are criteria in the
> > legal formulation of a trade secret shows the
> > equitable underpinnings of this area of the
> > law.  It seems only fair that one should be
> > able to keep and enjoy the fruits of their
> > labor. . . .  Because a commercial advantage
> > can vanish once the competition learns of it,
> >
> > the law should protect the businessman's
> > effort to keep their achievements secret.

756 F. Supp. at 983; see also EMC, 679 F.2d at 505 (the Fifth Circuit, in considering the "public

interest," held that "[t]he function of trade secret law is that of 'condemning the employment of

improper means to procure the trade secret,'") (citing K & G Oil v. L & G Fishing, 158 Tex. 594,

314 S.W.2d 782 (1958)); Zimmerman, 1996 WL 707107 at *2 ("[T]here is a strong public

interest in favor of protecting trade secrets.").

Indeed, the U.S. Supreme Court explicitly has recognized the importance of

protecting trade secret customer lists.  In Kewanee Oil Co. v. Bicron Corp., the Supreme Court

emphasized the negative costs to society resulting from the conversion of a company's valuable

trade secret customer list and ruled as follows:

> The necessity of good faith and honest, fair dealing is the very
> life and spirit of the commercial world.  **It is hard to see how the
> public would be benefited by disclosure of customer lists** . . . .
>
> In addition to the increased costs for protection from burglary,
> wiretapping, bribery, and other means used to misappropriate
> trade secrets, **there is the inevitable cost to the basic decency
> of society when one firm steals from another.**  A most

CutePDF - www.tweiu.com

> fundamental human right, that of privacy, is threatened when
> industrial espionage is condoned or is made profitable; the state
> interest in denying profit to such illegal ventures is unchallengable.

416 U.S. 470 (1974) (emphasis added).

Defendant, by contrast, has no equities on her side. She has intentionally breached her legal commitments, is converting Merrill Lynch's trade secret property, and has violated her fiduciary duties and duties of loyalty to Merrill Lynch. In this case, as in the cases cited above, Merrill Lynch seeks only to enjoin Defendant's conversion of Merrill Lynch's most precious business asset -- its confidential customer lists.

## III. EVEN WHEN ARBITRATION IS REQUIRED, MERRILL LYNCH IS STILL ENTITLED TO INJUNCTIVE RELIEF PENDING ARBITRATION

Even when a dispute is ultimately resolved in arbitration before the National Association of Securities Dealers ("NASD"), a brokerage firm is entitled to injunctive relief from a court pending the outcome in arbitration. Rule 10335 of the NASD Code of Arbitration Procedure (the "NASD Code") expressly permits Merrill Lynch to seek this relief in court. Furthermore, the Fifth Circuit in Ruscitto, and the 1st, 2nd, 3rd, 4th, 7th, 8th, 9th, 10th, and 11th Circuits, all have held that Merrill Lynch is entitled to this very injunctive relief pending the outcome in arbitration to preserve the status quo.[3]

---

[3] See Teradyne Inc. v. Mostek Corp. 797 F.2d 43 (1st Cir. 1986); Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 910 F.2d 1049 (2nd Cir. 1990); Ortho Pharmaceutical Corp. v. Amgen, Inc., 887 F.2d 460 (3rd Cir. 1989); Bradley, 756 F.2d at 1050; Merrill Lynch v. Salvano, 999 F.2d at 214; Peabody Coalsales Inc. v. Tampa Elec. Co., 36 F.3d 46, 48 (8th Cir. 1994); PMS Dist. Co. v. Huber, 863 F.2d 639 (9th Cir. 1988); Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dutton, 844 F.2d 726 (10th Cir. 1988); Hegarty, 808 F. Supp. at 1555.

20

## IV. CONCLUSION

For the reasons stated above, Merrill Lynch has shown a likelihood of success on the merits of its claims, that it will suffer irreparable harm, that the equities are in Merrill Lynch's favor, and that an injunction serves the public interest. Accordingly, Merrill Lynch seeks temporary injunctive relief pending the outcome of a lawfully held arbitration in accordance with Rule 10335(g) of the NASD Code of Arbitration Procedure.

Respectfully submitted,

David W. Green
Texas Bar No. 08347475
Federal Bar No. 11258
BARGER, HERMANSEN,
McKIBBEN & VILLAREAL, LLP
One Shoreline Plaza
800 North Shoreline Boulevard
Suite 2000, North Tower
Corpus Christi, Texas 78401
(361) 882-6611
(361) 883-8353 (telecopy)

Attorneys for Plaintiff Merrill Lynch,
Pierce, Fenner & Smith Inc.

Of Counsel:

Michael J. Fortunato
Daniel P. O'Meara
RUBIN & ASSOCIATES, P.C.
MCS Building
10 South Leopard Road
Suite 202
Paoli, PA 19301
(610) 408-2005
(610) 408-9050 (telecopy)